NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ALLERGAN SALES LLC and,
ALLERGAN, INC.,

Plaintiffs,

v.

SANDOZ, INC., and ALCON
LABORATORIES, INC.,

Defendants.

**OPINION**

Civ. No. 2:17-cv-10129 (WHW) (CLW)

**<u>Walls, Senior District Judge</u>**

This matter arises out of Sandoz, Inc. and Alcon Laboratories (together "Sandoz" or

"Defendants") filing an Abbreviated New Drug Application ("ANDA") with the Food and Drug

Administration seeking approval to sell generic copies of the ophthalmic drug Combigan®,

owned by Allergan Sales, LLC and Allergan, Inc. (together "Allergan" or "Plaintiffs"). The

amended complaint asserts three patents: U.S. Patent Nos. 9,770,453 ("the '453 patent");

9,907,801 ("the '801 patent"); and 9,907,802 ("the '802 patent").

The parties request claim construction under *Markman v. Westview Instruments, Inc.*, 52

F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). In addition, Plaintiffs move for a

preliminary injunction under Fed. R. Civ. P. 65(a). For the reasons that follow, the Court adopts

Plaintiffs' proposed claim constructions and grants Plaintiffs' motion for preliminary injunction.

## BACKGROUND

### A. Technology background

Combigan® is an ophthalmic drug used to treat glaucoma and ocular hypertension. Pls.'

Opening Br. at 2, ECF No. 57. Both diseases are caused by elevated pressure inside the eye

known as Intraocular Pressure ("IOP"), which can cause damage to the optic nerve. Patients with

NOT FOR PUBLICATION

elevated IOP but without damage to the optic nerve are typically diagnosed with ocular hypertension, while patients with elevated IOP and detectable optic nerve damage are typically diagnosed with glaucoma. *Id.* at 2; Defs.' Opening Br. at 3, ECF No. 58.

Combigan® is a combination of two drugs that were already on the market for treatment of glaucoma and ocular hypertension: .2% brimonidine tartrate and .68% timolol maleate. When administered individually, brimonidine is typically dosed three times a day ("TID"), and timolol is dosed either twice a day ("BID") or once a day. Both drugs have adverse effects, and the FDA-approved label of brimonidine warns against combining it with timolol. When the drugs were occasionally prescribed together, it was done in "serial" therapy – two drugs in separate bottles – with timolol twice daily and brimonidine three times daily. Pls.' Opening Br. at 5.

Combigan® combines the two compositions in a single bottle, known as a "fixed combination," and is administered BID. *Id.* at 6. As required by the FDA, Allergan conducted a series of clinical trials on Combigan®: the 012T, 013T, 507T, 019T, 023T, and 024T studies. The studies showed that Combigan® was superior to serial therapy because it could be administered twice daily (rather than three times) without a loss in efficacy. *Id.* at 7–8. Twice-daily administration of brimonidine caused a spike in IOP in the afternoon, known as the "afternoon trough," which did not occur for patients treated with twice-daily Combigan®. Combigan® was also an improvement because patients experienced less adverse effects than they would with existing treatment. *Id.*

Plaintiffs state that as a result of these improvements, Combigan® is one of the highest selling products in Allergan's eye care portfolio, with sales reaching ██████████ in 2017. Pls.' PI Br. at 11–12, ECF No. 124.

NOT FOR PUBLICATION

## B. Patent prosecution

Defendants claim that during the 16-year prosecution of this patent family, Allergan omitted clinical test results and FDA criticism of certain studies from the PTO. Defs.' PI Opp. at 10, ECF No. 115.

According to Defendants, during prosecution of the '149 patent, Allergan submitted a declaration of Dr. Rhett Schiffman which stated the "percentage of patients in the [Combigan®] group experiencing adverse events of the nervous system" was 0.0%. Schiffman Decl., Table A, Saveriano Decl. Ex. 50, ECF No. 116-50. Dr. Schiffman was reporting data only from the 019T study, but did not disclose that the 507T study showed that Combigan® did cause nervous-system side effects. *See* F.J. Goni, *12-Week Study Comparing Fixed Combination of Brimonidine and Timolol with Concomitant use of the Individual Components in Patients with Glaucoma and Ocular Hypertension*, at 586, Saveriano Decl. Ex. 30, ECF No. 116-30.

Allergan later disclosed the 507T study, but went on to state that "[h]owever, the frequency of nervous system adverse events was still significantly less than that observed for the three times a day brimonidine, twice a day timolol combination adjunctive therapy." Reply Under 37 C.F.R. § 1.111 at 4, Saveriano Decl. Ex. 51, ECF No. 116-56. Defendants assert that this was untrue because (1) it was not unexpected that BID brimonidine would have fewer side effects without loss of efficacy; (2) the 012T study showed that Combigan® had a higher incidence of adverse events than the prior art; (3) the 507T study showed higher incidence of somnolence than the prior art; and (4) Allergan never disclosed the FDA's criticisms of the 012T, 013T, and 019T studies to the PTO. Defs.' PI Opp. at 12–13.

Defendants also assert that during prosecution of the '890 patent, Allergan provided the 013T study to show that the claims showed reduced adverse effects over the prior art, but did not

NOT FOR PUBLICATION

disclose the 012T study which had higher incidents of some adverse events. *See* Interview Summary at *52-002, Saveriano Decl. Ex. 52, ECF No. 116-52; Allergan Clinical Study Report at 7, Saveriano Decl. Ex. 37, ECF No. 116-37; FDA Review of Allergan's New Drug Application at 29–30, Saveriano Decl. Ex. 46, ECF No. 116-46.

Defendants also claim that during prosecution of the '802 patent (one of the patents in suit), Allergan disclosed some of the omitted references, but buried them in a barrage of marginally relevant documents. Allergan also omitted a report from its litigation expert Dr. Duh showing that brimonidine was more effective than Combigan® for certain ocular hypertension patients (the "Duh report"). Tr. of Bench Trial at 104:22–105:5, Saveriano Decl. Ex. 60, ECF No. 116-60.

### C. Prior litigation about related patents

The parties have been involved in extensive litigation since 2009 about related patents in the patent family. Allergan is the holder of a New Drug Application ("NDA") for the brimonidine tartrate/ timolol maleate ophthalmic solution sold as Combigan®, and has listed ten patents that cover the approved formulation or methods with the FDA. On November 20, 2008 Sandoz submitted its Abbreviated New Drug Application ("ANDA") to the FDA, seeking approval to manufacture and sell a generic version of Combigan®. On April 7, 2009, Allergan filed suit against Sandoz in the Eastern District of Texas, asserting related patents U.S. Patent Nos. 7,030,149, 7,320,976, 7,323,463, and 7,642,258 ("*Combigan® I*").[1] The district court found that Sandoz's proposed generic infringed Allergan's patents, and enjoined Defendants from manufacturing the generic until the expiration of the patents.

---

[1] The parties refer to the first case as "*Combigan® I*," and this Court will do the same.

NOT FOR PUBLICATION

On appeal, the Federal Circuit found the '463 patent, which claimed the timolol/brimonidine combination, invalid as obvious. *See Allergan, Inc. v. Sandoz Inc.* ("*Combigan® I Appeal*"), 726 F.3d 1286, 1294 (Fed. Cir. 2013). However, unlike the '463 patent, claim 4 of the '149 patent contained the additional limitation that the "daily number of doses of brimonidine be reduced from 3 to 2 times a day *without loss of efficacy*." *Id.* at 1293 (emphasis in original). The court found that the prior art would not show that this combination would lead to the elimination of the "afternoon trough," and accordingly held claim 4 of the '149 patent nonobvious and affirmed the injunction. *Id.* at 1294.

Sandoz then amended its ANDA to remove the indicated use for glaucoma, and instead indicate use for ocular hypertension only. Allergan brought suit again, this time asserting, *inter alia*, U.S. Patent No. 8,748,425 ("the '425 patent"), and the court held a bench trial ("*Combigan® II*").[2] The District Court found the '425 patent not invalid, and found it infringed by Defendants' ANDA. The court again enjoined Sandoz from making or selling the Combigan® generic until the patents expired.

On December 22, 2017, the Federal Circuit affirmed in part and reversed in part, finding that Sandoz's ANDA did not infringe the '425 patent. *Allergan Sales, LLC v. Sandoz, Inc.* ("*Combigan® II Appeal*"), 717 F. App'x 991, 994 (Fed. Cir. 2017). The court first held the patents not invalid, reasoning that although the concomitant administration of the two drugs is obvious, "each asserted claim . . . expressly recites an additional efficacy limitation that further restricts the method of administering the composition twice daily: (1) 'without loss of efficacy' . . . ; and (3) 'reduc[ing] the incidence of one or more adverse events.'" *Id.* The court held that

---

[2] Two separate lawsuits were filed in the Eastern District of Texas after Sandoz amended its ANDA, which the parties refer to them as *Combigan® II* and *Combigan® III*. The cases were consolidated for the bench trial.

these efficacy limitations were nonobvious and "not inherent in the administration of the opthalmic composition." *Id.* at 994.

However, the court found that the ANDA did not infringe the '425 patent. While the '425 patent recites ".5% timlol free base," Combigan® and the ANDA contain .68% timlol maleate. *Id.* at 995–96. Although .5% timlol free base is chemically equivalent to .68% timlol maleate, the court reasoned that chemical equivalency is not sufficient to show literal infringement. *Id.* The court accordingly reversed the injunction against Sandoz.

### D. Procedural history

Allergan commenced this action October 30, 2017. Compl. ¶ 14, ECF No. 1. The amended complaint asserts three patents: the '453 patent, the '801 patent, and the '802 patent. Am. Compl. ¶ 1, ECF No. 66. All three patents claim compositions comprising brimonidine and timolol for ophthalmic delivery and a method of treatment. The patents claim a composition comprising .2% w/v brimonidine and .68% w/v timolol maleate (rather than .5% timlol free base), and are therefore not susceptible to the defect that caused the Federal Circuit to reverse the most recent injunction against Sandoz. *Id.* ¶ 32.

The parties dispute a group of clauses referred to collectively as the "wherein" clauses. There are two types of disputed "wherein" clauses: efficacy and adverse events. Claim 1 of the '453 patent contains both types of "wherein" clauses, and reads:

> A method of treating a patient with glaucoma or ocular hypertension comprising topically administering twice daily to an affected eye a single composition comprising 0.2% w/v brimonidine tartrate and 0.68% w/v timolol maleate, *wherein the method is as effective as the administration of 0.2% w/v brimonidine tartrate monotherapy three times per day* and *wherein the method reduces the incidence of one or more adverse events selected from the group consisting of conjunctival hyperemia, oral dryness, eye pruritus, allergic conjunctivitis, foreign body sensation, conjunctival folliculosis, and somnolence, when compared to the administration of 0.2% brimonidine tartrate monotherapy three times daily.*

6

NOT FOR PUBLICATION

Claim 1 of the '802 patent also contains a "wherein" clause relating to efficacy, and claim 1 of the '801 contains a "wherein" clause relating to reduced adverse events. The '801 patent also contains dependent claims containing "wherein" clauses identifying specific adverse events. Claim 3 is exemplary, and reads: "The method of claim 1, *wherein the adverse event is conjunctival hyperemia*."

The parties dispute whether the "wherein" clauses are claim limitations. Plaintiffs contend that they are limiting, and that the terms should be given the same construction as they have been given in earlier litigation of related patents. Defendants argue that the clauses are not limiting and do not take a position on the appropriate construction of the disputed terms, should this Court determine that they are limiting.

On March 21, 2018, the parties submitted a joint claim construction and prehearing statement. Opening *Markman* briefs were filed April 3, 2018, and response briefs filed April 17.

On April 30, Plaintiffs moved for a preliminary injunction. Defendants responded May 25, 2018, and Plaintiffs filed their reply June 5. Oral argument was held on June 13, 2018.

The Court will first construe the claims under *Markman*, and then discuss Plaintiffs' motion for injunctive relief.

## I.   <u>Claim Construction</u>

### STANDARD OF REVIEW

Claim construction is a legal issue for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976-78 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). To construe claim terms, a court should first look to intrinsic evidence—the claims themselves, the specification and the prosecution history. *Philips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). The starting point of any analysis is the words of the claim. *Vitronics Corp. v.*

NOT FOR PUBLICATION

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "When construing patent claims, there is a heavy presumption that the language in the claim carries its ordinary and customary meaning amongst artisans of ordinary skill in the relevant art at the time of the invention." *Housey Pharm., Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004). The term's usage in the claim provides insight into its meaning, and claim terms must be interpreted in the context of the claims describing the patented invention. *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008).

The specification is particularly important in claim construction. "[C]laims must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979); *see also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent application describes the invention."). When a patentee sets forth a definition of the disputed claim term in the specification, that definition "controls the meaning of [the claim term], regardless of any potential conflict with the term's ordinary meaning[.]" *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1374 (Fed. Cir. 2003). Courts may also consider a patent's prosecution history—the complete record of all proceedings before the U.S. Patent and Trademark Office ("PTO") that led to the award of the patent. *Vitronics*, 90 F.3d at 1582.

After intrinsic evidence, a court may look to extrinsic evidence, including dictionary definitions, technical treatises or expert testimony. Expert testimony may provide useful background information, but "opinion testimony on claim construction should be treated with the utmost caution." *Vitronics*, 90 F.3d at 1585. Such testimony "may only be relied upon if the

NOT FOR PUBLICATION

patent documents, taken as a whole, are insufficient to enable the court to construe disputed

claim terms. Such instances will rarely, if ever, occur." *Id.*

## DISCUSSION

Plaintiffs argue that the "wherein" clauses are claim limitations. Plaintiffs contend that

their position is supported by the language of the claims and the prosecution history. Plaintiffs

further assert that when a "wherein" clause "expresses the inventive discovery," or is "material

to patentability," the clause is generally treated as limiting. Pls.' Opening Br. at 22. Plaintiffs

also argue that Defendants have treated similar clauses as limiting in litigation of related patents.

Defendants argue that each of the disputed terms simply expresses the intended result of a

process step while adding nothing to the substance of the claim, and therefore does not limit the

scope of the invention. Defendants contend that the "wherein" clauses are not limiting because

they simply express the intended results of the claimed method (administering Combigan® twice

per day) and the expressly claimed dosage amounts. Defs.' Opening Br. at 17, 22. Defendants

also argue that Plaintiffs' previous and current litigation positions confirm that the terms are non-

limiting because Plaintiffs do not claim that all patients will experience the effectiveness and

reduced adverse events described in the "wherein" clauses for purposes of infringement.

This Court finds that the "wherein" clauses are limiting because they are material to

patentability and express the inventive aspect of the claimed invention. "[W]hen a 'whereby'

clause states a condition that is material to patentability, it cannot be ignored in order to change

the substance of the invention." *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1330 (Fed Cir. 2005).

NOT FOR PUBLICATION

Such clauses are limiting if they "relate back to and clarify what is required by the [claim]," and "express[] the inventive discovery." *Griffin v. Bertina*, 285 F.3d 1029, 1034 (Fed. Cir. 2002).[3]

Claim terms are not limiting when they simply express the "intended result[s]" of the invention. *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1375 (Fed Cir. 2001). However, courts have held that claim terms stating the unexpected and improved effects of the administration of a claimed compound may be limiting if they "express the invention of the claimed compound." *AstraZenica AB v. Dr. Reddy's Labs., Ltd.*, No. 05-5553 (JAP), 2010 WL 1981790, at *11 (May 18, 2010 D.N.J.); *see Javelin Pharms., Inc. v. Mylan Labs. Ltd.*, No. 16-224-LPS, at *3 (Oct. 10, 2017 D. De.) (finding similar clause limiting because "although the wherein clause recites a result of the claimed method, it is also material to patentability"); *see also Desenberg v. Google, Inc.*, 392 F. App'x 868, 871 (Fed Cir. 2010) (clause limiting because the patent examiner required its inclusion as a condition of patentability); *Eltech Sys. Corp. v. PPG Indus., Inc.*, 710 F. Supp. 622, 633 (W.D. La. 1988) (finding "whereby" clause limiting when the clause was used to distinguish claims over prior art during patent prosecution).

Combigan®'s ability to reduce daily administrations from TID to BID without a loss of efficacy, and with reduced adverse events, is material to its patentability. The Federal Circuit has twice held that Allergan's patents are nonobvious only because of these limitations. In *Combigan® I Appeal*, the Federal Circuit found claim 4 of the '149 patent not invalid because unlike the '463 patent, "it contain[ed] the additional limitation that daily number of doses of brimonidine be reduced from 3 to 2 times a day *without loss of efficacy*." 726 F.3d at 1293

---

[3] "Whereby" and "wherein" clauses are treated the same in this context. *Prometheus Labs. Inc. v/ Roxane Labs., Inc.*, Nos. 11-230 (FSH), 11-1241 (FSH), 2013 WL 5333033, at *5 n.7 (D.N.J. Sept. 23, 2013).

NOT FOR PUBLICATION

(emphasis in original). In *Combigan® II Appeal*, 717 F. App'x at 992, the court held the related patents not invalid, reasoning that although the concomitant administration of the two drugs is obvious, "each asserted claim . . . expressly recites an additional efficacy limitation that further restricts the method of administering the composition twice daily: (1) 'without loss of efficacy' . . . ; and (3) 'reduc[ing] the incidence of one or more adverse events.'" The court rejected Sandoz's argument that "the asserted claims merely recite the inherent results of administering an obvious combination." *Id.* at 994.

Additionally, the prosecution history shows that Allergan distinguished their claimed method from the prior art on the basis of its effectiveness and reduction in adverse events. As example, the Examiner allowed the '453 patent only after reviewing the Federal Circuit's opinion in *Combigan® II Appeal*, and differentiated the method over the prior art because of its efficacy and reduction in adverse events. *See* Response to Non-Final Office Action at AGN_COM00765792–94, Walsh Decl. Ex. Z, ECF No. 57-4. Further, the specification references the 013T study, which demonstrated the novel aspect of Combigan® and provided the basis for the "wherein" clauses.

Defendants' reliance on *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1377 (Fed Cir. 2001) is unpersuasive. There, the Federal Circuit considered a claim that read "[a] method for reducing hematologic toxicity in a cancer patient undergoing [t]axol treatment comprising parenterally administering to said patient *an antineoplastically effective amount* of about 135-175 mg/m$^2$ taxol over a period of about three hours." The court held that "an antineoplastically effective amount" was non-limiting because unlike the express dosage amounts, the clause was a statement of intended result that did not "change those amounts or otherwise limit the claim." *Id.* at 1375. Defendants rely on this language and argue that the

11

NOT FOR PUBLICATION

"wherein" clauses here similarly express the intended result that "essentially duplicates the dosage amounts recited in the claims." Defs.' Opening Br. at 23.

However, the *Bristol-Myers Squibb* court went on to consider whether the terms were material to patentability. 246 F.3d at 1375. The court emphasized that they were not, noting that the addition of the clause was "voluntarily made after the examiner had already indicated to [the patentee] that the claims were patentable." *Id.* The court also rejected an argument that the clauses should be found limiting to preserve their validity, reasoning that the clauses "d[id] not impart patentability to [the patentee's] claims because, as we hold here, they do not distinguish those claims over the prior art." *Id.* at 1377; *see Prometheus Labs. Inc. v. Roxane Labs., Inc.*, Nos. 11-230 (FSH), 11-1241 (FSH), 2013 WL 5333033, at *6 (D.N.J. Sept. 23, 2013) ("There is also no indication that [the disputed term] was added to distinguish prior art or overcome a patent examiner's rejection . . . .").

Here, unlike in *Bristol-Myers Squibb*, the prosecution history clearly demonstrates that the "wherein" clauses were the very reason the Examiner allowed the patents. Further, the Federal Circuit has already held that the "wherein" clauses here "distinguish th[e] claims over the prior art." *See Combigan® I Appeal*, 726 F.3d at 1294 ("Sandoz has failed to point to evidence in the prior art that would allow us to conclude that the addition of timolol to brimonidine dosed twice per day would eliminate the afternoon trough issue."). Defendants' argument that the "wherein" clauses merely reflect the inherent results of the claimed composition is merely a repackaging of its invalidity argument that the Federal Circuit has already rejected. *See Combigan® II Appeal*, 717 F. App'x at 994 ("The efficacy limitations are

NOT FOR PUBLICATION

also not inherent in the administration of the ophthalmic composition, a finding adequately supported by the record.").[4]

Plaintiffs' position is further supported by two basic principles of claim construction. First, "claims are generally construed so as to sustain their validity, if possible." *Becton, Dickinson and Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed Cir. 2010) (quoting *Whittaker Cop. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed Cir. 1990)). Second, "[c]laims must be 'interpreted with an eye toward giving effect to all terms in the claim.'" *Id.* at 1257 (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed Cir. 2006)). Finding the "wherein" clauses non-limiting would render many of the claims in the patents-in-suit meaningless, including fourteen claims of the '801 patent.

Defendants' earlier litigation positions further support a finding that the claims are limiting. Defendants have sought construction of identical "wherein" clauses in earlier litigation of related patents. While Defendant repeatedly asserts that it has never previously litigated whether the clauses are limiting, there would have been no reason for it to seek construction of nonlimiting terms.

## CONCLUSION

The Court finds the "wherein" clauses limiting, and adopts Plaintiffs' proposal to construe the claims in the same way as in earlier litigation.

---

[4] The Court also rejects Defendants' argument that a "wherein" clause is limiting only if it adds a "manipulative difference" in the steps of the claim. Defs.' Opening Br. at 19.  The Federal Circuit rejected this argument in *Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002), and found a preamble and "wherein" clause limiting even though they did not add a manipulative step to the claimed invention. The court reasoned that even though they did not add a manipulative difference, the terms were limiting because they "give[] 'life and meaning' to the manipulative steps." *Id.* quoting (*Kopra v. Robie*, 38 C.C.P.A. 858, (1951)).

NOT FOR PUBLICATION

## II.     <u>Motion for Preliminary Injunction</u>

### STANDARD OF REVIEW

Plaintiffs also move for a preliminary injunction to preserve the status quo and prevent a generic launch. Pls.' PI Br. at 1. Courts are empowered to grant preliminary injunctions to prevent the violation of patent rights. *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1362 (Fed. Cir. 2005). A party seeking preliminary injunctive relief must demonstrate: (1) a likelihood of success on the merits of its claims, (2) that it will be irreparably harmed if the Court denies its motion, (3) that the "balance of equities" tips in its favor, and (4) that the injunction is in the public interest. *Id.* The Federal Circuit instructs courts to "weigh and measure each factor against the other factors and against the form of magnitude of the relief requested." *Eisai Co., Ltd v. Teva Pharm. USA, Inc.*, Nos. 05-5727 (HAA)(ES), 07-5489 (HAA)(ES), 2008 WL 1722098, at *2 (Mar. 28, 2008 D.N.J.) (quoting *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed Cir. 1988)).

The party seeking equitable relief need not establish the validity of the patent beyond question, but must present a "clear case supporting the validity of the patent in suit." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2000). Similarly, the party opposing the injunction does not need to make out a case of actual invalidity, but must only raise "a substantial question concerning either infringement or validity." *Id.*

### DISCUSSION

Plaintiffs assert that they can demonstrate a likelihood of success on the merits, and that a preliminary injunction is necessary to prevent lost revenues and market share, price erosion, loss of employees, lost research and development revenues, and harm to its goodwill.

NOT FOR PUBLICATION

Defendants argue that because the "wherein" clauses are not limiting, Plaintiffs cannot demonstrate a likelihood of success on the merits. Defendants contend that any potential harm to Plaintiffs can be remedied by money damages, and that the equities weigh against Plaintiffs because of their conduct before the PTO during prosecution.

### a.   Plaintiffs are likely to succeed on the merits.

Plaintiffs argue that the "wherein" clauses are limiting, and refer to their *Markman* brief. Plaintiffs accordingly argue that Sandoz's generic will directly infringe their patents because (1) it contains an identical formulation of compounds; (2) it calls for identical treatment protocol; and (3) it will have an identical treatment effect. Plaintiffs contends that Defendants cannot claim noninfringement and have not raised substantial question of enforceability. Plaintiffs assert that Defendants are barred from raising an inequitable conduct defense because it was a compulsory counterclaim in earlier litigation, and maintain that Defendants' inequitable conduct counterclaim is without merit in any event.

Defendants respond that the "wherein" clauses are not limiting, and without those clauses their invalidity case is exceptionally strong in light of the Federal Circuit's earlier holdings that the concomitant administration of brimonidine and timolol twice a day is obvious. Defs.' PI Opp. at 20. Defendants argue that the validity of the '453, '801, and '802 patents has never been litigated, so the other cases involving different patents do not help Plaintiffs.

Having held that the "wherein" clauses are limiting, the Court finds Plaintiffs are likely to succeed on the merits. The Federal Circuit has made clear that Allergan's patents involving timolol/ brimonidine administration are not invalid if they claim the efficacy and adverse events limitations. Defendants do not raise any argument that Plaintiffs are unlikely to succeed on the merits if this Court finds the "wherein" clauses limiting.

NOT FOR PUBLICATION

Defendants also do not argue that Plaintiffs are unlikely to succeed on the merits due to inequitable conduct. Even if this Court were to consider this argument, Defendants have still failed to raise a "substantial question concerning . . . validity." *Amazon.com*, 239 F.3d at 1350–51. To prove inequitable conduct, Sandoz will have to demonstrate by clear and convincing evidence that the patents would not have issued "but for" the omission, and that Allergan acted with the intent to deceive the PTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). Defendants' materiality argument, at this stage, appears weak. Because the Federal Circuit has held that Combigan® was a nonobvious improvement over prior art, it will be difficult for Defendants to now argue that the patents were obtained by fraud. Further, as Defendants acknowledge, Plaintiffs disclosed most of the allegedly withheld data before the patents issued. Finally, many of the reports are not actually contradictory to Plaintiffs' position as Defendants claim. As example, contrary to Defendants' argument, the 012T and 013T studies had similar results, and Combigan® outperformed brimonidine in both. Pls'. PI Reply at 10, ECF No. 124.

As to "intent to deceive," Sandoz conclusorily states that the "single most reasonable inference from Allergan's 16-years of duplicity is a specific intent to deceive the Patent Office about the inventiveness of what it has claimed." Defs.' PI Opp. at 29. Sandoz has no specific allegations about why this is the single most reasonable inference, and the inference is rebutted by Allergan's later good-faith disclosure of the allegedly withheld data.[5]

---

[5] Having found the inequitable conduct counterclaim insufficient to raise a substantial question as to enforceability, the Court need not resolve Plaintiffs' claim preclusion argument at this stage.

16

NOT FOR PUBLICATION

      **b.  Plaintiffs have demonstrated that they will suffer irreparable harm if injunctive relief is not granted.**

Plaintiffs argue that a launch of Sandoz's generic product would have significant and irreparable consequences. Plaintiffs contend that Defendants' entry would cause immediate reduction in market share and price erosion that could not be corrected even if Defendants were later forced to withdraw from the market. Plaintiffs also assert that reduction in market share would cause them ██████████████████ irreparably impact research and development, and damage customer goodwill. Plaintiffs have submitted declarations of Allergan's Vice President of U.S. Eye Care Sales David LeCause and Vice President of Charles River Associates ("CRA") Robert Maness, Ph.D. in support.

Defendants respond that Plaintiffs' irreparable harm arguments are mere generalizations that apply in every case involving a branded drug manufacturer. Defendants argue that Plaintiffs do not explain why money damages would be inadequate compensation.

This Court finds that Plaintiffs have shown that they will suffer irreparable harm unless injunctive relief is granted. The Federal Circuit has found loss of market share, loss of revenue, and price erosion caused by generic entry to constitute irreparable harm. *See Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 872–73 (Fed. Cir. 2017); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361–62 (Fed. Cir. 2008) (affirming district court's finding that generic entry would cause irreparable harm, and collecting cases).

Plaintiffs have supported their argument with a declaration of David LeCause, where he states that the launch of a Combigan® generic would have permanent effects on the market that could not be remedied by money damages. LeCause declares that in his experience, a generic alternative will quickly gain a majority of the market share, and that managed health care organizations like PBMs and HMOs are unwilling to return to pre-generic launch prices even

NOT FOR PUBLICATION

after the generics are removed from the market. LaCause Decl. ¶ 13. In his declaration, Maness

reported studies showing that branded drugs typically lose between 50% and 90% in sales within

one year of generic entry. Maness Decl. ¶ 20.

     The declarations also support Plaintiffs' contention that generic entry would force them

███████████████████████████████████████ Maness declares that because Combigan®

is one of Allergan's largest selling glaucoma products, generic entry would likely ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ *see AstraZeneca LP v.*

*Apotex, Inc.*, 623 F. Supp. 2d 579, 612 (D.N.J. 2009) ("The Court agrees . . . that the damage

caused by a loss of personnel and the impact this would have on the company are indeed

significant and unquantifiable.").

     Both LeCause and Maness declare that Allergan would suffer a loss of goodwill if

Sandoz's generic alternative entered and was withdrawn from the market, because Allergan

would be blamed for the removal of the low-cost alternative. LeCause Decl. ¶ 18; Maness Decl.

¶ 32.

     Denying relief will also reduce available funds for research and development, as

Plaintiffs reinvest ██████ of revenue back into research and development. Maness Decl. ¶¶ 33–

34; *see Eisai Co.*, 2008 WL 1722098, at *11 ("[I]f there is a reasonable likelihood that research

on future drugs . . . will be eliminated, or even reduced or delayed, then the harm is

irreparable.").

Contrary to Defendants' argument that Allergan "does not explain why money damages would be inadequate," Allergan has clearly and specifically articulated the reasons why the harm caused by generic entry would be irreparable.

### c.  The balance of hardships and equities favors Plaintiffs.

Plaintiffs argue that the balance of hardships favors injunctive relief. While Defendants' entry into the market would cause irreparable harm to Plaintiffs, maintaining the status quo would cause only minimal hardship to Defendants. Any potential loss in revenue to Defendants could be remedied by money damages, which could be secured by a bond.

Defendants argue that the balance of equities tip against Allergan because they chronically withheld unfavorable clinical-trial results from the PTO during patent prosecution and therefore have unclean hands. Sandoz claims that the Schiffman declaration constituted affirmative egregious misconduct, and that the "single most reasonable inference" is a specific intent to deceive the PTO about the inventiveness of what it has claimed. Sandoz argues that this Court does not need to resolve the inequitable conduct claim, and should find that Allergan's omissions and misrepresentations tilt the equities in Sandoz's favor even if they fall short of inequitable conduct.

This Court finds that the balance of equities favors the grant of the injunction. To determine the balance of the equities, "[t]he district court must weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017). If the injunction is not granted, Plaintiffs stand to lose market share, goodwill, employees, and research and development opportunities. *See Impax Labs., Inc. v. Aventis Pharm., Inc.*, 235 F. Supp. 2d 390, 396 (D. Del. 2002). On the other hand, if the injunction is granted, Defendants

NOT FOR PUBLICATION

only stands to lose profits. Sandoz has already been thrice enjoined from entering the market, and the only reason they are not currently subject to an injunction is that the earlier patents in the family claimed .5% timolol free base instead of .68% w/v timolol maleate. In light of these repeated delays, any hardship to Sandoz arising out of further delay would be minimal, and moreover, could be remedied with damages. Defendants' reliance on the equitable principle of unclean hands is weakened by its own failure to raise these arguments in the nine years of earlier litigation.

Defendants do not cite any case law in which inequitable conduct arguments were used to bar injunctive relief, but Plaintiffs in their reply brief provide authorities where courts have rejected "unclean hands" arguments that merely repackage weak claims of inequitable conduct. *See Chamberlain Grp, Inc. v. Techntronic Indus. Co.*, No. 16-C-6097, 2017 WL 1101092, at *17 (N.D. Ill. Mar 22, 2017); *Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, No. 15-cv-3654, 2016 WL 5348866, at *13 (D.N.J. Sept. 23, 2016). Whatever merit Defendants' inequitable conduct argument may have, it is not sufficient to overcome Plaintiffs' showing at this stage.

### d.  The public interest favors granting injunctive relief.

Plaintiffs argue that the public interest favors a grant of injunctive relief because it furthers the public interest of enforcing patent rights and encouraging innovation. Injunctive relief also serves the public interest by promoting judicial efficiency. If Sandoz's generic goes to market and this Court later determines that the claims of the patents-in-suit are infringed, the parties and Court will have to quantify the injury caused by Sandoz's conduct, and additional litigation may be required to determine damages.

NOT FOR PUBLICATION

Defendants argue that Plaintiffs' patents are invalid, and there is no public interest in enforcing invalid patent rights. Defendants also argue that denying the preliminary injunction will further the public interest in having access to low cost generic alternatives.

This Court finds that the public interest is served by granting the injunction. Plaintiffs are likely to prove the patents are valid, and there is a strong public interest in enforceable patent rights to promote innovation and investment in new technology. *See Abbott Labs.*, 544 F.3d at 1362–63.

## CONCLUSION

This Court adopts Allergan's proposed claim constructions and find the "wherein" clauses limiting. Further, Allergan's motion for a preliminary injunction is granted. An appropriate order follows.

DATE: 13 July 2018

William H. Walls
Senior United States District Court Judge